E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
KATHY YU (Cal Bar No.  268210)
Assistant United States Attorneys
Violent and Organized Crime Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2431/2624
        Facsimile: (213) 894-0141
        E-mail:    kathy.yu@usdoj.gov
                   chelsea.norell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-362(A)-JAK |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
| v. | |
| DONAVIN DWAYNE BRADFORD,<br>   aka "Pay Me,"<br>   aka "Pay Me Strips"<br>   aka "Xtra Drippy,"<br>   aka "Tray Xtras," | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Chelsea Norell and
Kathy Yu, hereby file its Trial Memorandum.

     This Trial Memorandum is based upon the attached memorandum of
points and authorities, the files and records in this case, and meet
//
//

1

and confer calls the government has had with defense counsel, and
such further evidence and argument as required by the Court.

Dated:  April 5, 2023        Respectfully submitted,

                             E. MARTIN ESTRADA
                             United States Attorney

                             MACK E. JENKINS
                             Assistant United States Attorney
                             Chief, Criminal Division


                             _____/s/_____
                             CHELSEA NORELL
                             KATHY YU
                             Assistant United States Attorneys

                             Attorneys for Plaintiff
                             UNITED STATES OF AMERICA

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   STATUS OF THE CASE**

3

   Trial for remaining defendant Donavin Dwayne Bradford is set

4

for April 11, 2023.  The estimated time for the government's case-

5

in-chief is four to five days, during which the government

6

anticipates calling approximately 10 witnesses to testify as

7

outlined in the Government's previously filed witness list (Dkt.

8

57).  The parties have tentatively reached a stipulation[1] regarding

9

two of the government's witnesses who are offered for foundation

10

and/or chain of custody only, which would modestly reduce the

11

government's time estimate to approximately four to four-and-a-half

12

days, depending on the length of jury selection and cross

13

examinations.

14

   The parties have submitted a joint statement of the case (Dkt.

15

56), jointly proposed jury instructions (Dkt. 53), disputed jury

16

instructions (Dkt. 58), a jointly proposed verdict form (Dkt. 52),

17

and the government's initial exhibit list with defendant's

18

stipulation regarding the authenticity and admissibility of the

19

evidence (Dkt. 54).  The government has also filed its proposed voir

20

dire (Dkt. 55) and its witness list (Dkt. 57).  Defendant's motion

21

in <u>limine</u> to exclude the government's expert witness (Dkt. 48), and

22

defendant's motion to dismiss counts (Dkt. 47), which the government

23

opposed (Dkts. 59, 60), were decided by the Court this week.  (Dkt.

24

76.)

25

**II.   THE GOVERNMENT'S CASE**

26

   The government will show that defendant recruited, enticed,

27

28

   [1] On April 4, 2023, defense counsel confirmed his agreement to
the stipulation and the government will include the trial
stipulation as an exhibit once it has a signed copy.

1

harbored, transported, provided, obtained, and maintained at least
three minors, ages 15 and 17 – K.P., K.M., and L.C. – between
approximately June 2021 and March 2022.  The government will present
evidence that defendant recruited minor girls from a foster home,
provided them with cellphones, hotel rooms, clothes, and salon
services, and in exchange, these girls became part of defendant's
"stable," a group of sex workers who were loyal to defendant and
gave him all the earnings from their commercial sex work.  Evidence
from defendant's cellphone and Instagram account, as well as the
testimony of his co-defendant L.V., will show that defendant
actually knew his victims were minors, recklessly disregarded the
fact that they were minors, and/or had a reasonable opportunity to
observe his minor victims.

　　　　Defendant controlled all four of the named victims (K.P., K.M.,
L.C, and L.V.) in myriad ways.  He controlled their appearance,
instructing them on what to wear, what photos to post on commercial
sex websites, and when they "earned" enough, allowing them to go to
the salon for hair and nail services.  Defendant gave his victims
cellphones, but used them as an electronic leash, requiring his
victims to report to him when they "caught a date" (secured a sex
customer), what sex act they were hired to perform, and how much
money they made (which defendant could audit against how many
condoms his victims went through in a night).  Defendant controlled
when his victims worked and when they were done for the day.
Defendant set rules for his victims.  For example, they were not
permitted to fraternize with other men or have sex with anyone other
than defendant or their paying clients.  If defendant suspected that
one of his victims was having sex with someone else, defendant would

discipline her for giving away "his product" for "free."  Discipline included violence, threats of violence, and threats of being "fired."

Defendant also filmed himself engaging in sex acts with the minor victims.  In one of the videos, depicting defendant engaged in a threesome with Minor K.P. and a "renegade" (a prostitute who does not have a pimp), defendant violently forced himself on the victim, manually opening her legs and removing her hands from her genitals to access her.  The government will show the jury only short clips from this 29-minute video, to meet its burden on Count Three.  The government's clips include a portion where there is no child sexual abuse material, but defendant can be heard extolling the allegedly glamorous life of being a pimp or prostitute, which speaks to defendant's recruitment of sex workers.  The video is synced with a transcript, and the government provided the transcript excerpts to defense counsel.

Defendant's most senior and trusted sex worker, referred to as his "bottom," "L.V.," worked with defendant to supervise the minors, transported them to sex appointments (referred to as "dates"), reported to defendant on the progress of these dates, booked hotel rooms for their dates, and appeared in commercial sex advertisements with them.  Defendant used violence, threats of violence, and coercion to traffic L.V.  L.V. has pleaded guilty to conspiracy to sex traffic and sex trafficking of Minor K.P., and she is expected to testify against defendant.  We expect that she will do so reluctantly, as she has expressed continuing love for defendant and fear of the consequences of testifying against him.

At trial, the government will present, among other things,

(1)   the testimony of a human trafficking expert who will explain the unique vernacular of the pimp-prostitute world, which is used throughout defendant's communications with his victims, and will explain the methods and techniques pimps use to groom, exploit, control, and sell their prostitutes, which is essential to understanding defendant's communications with his victims, and the factors specific to the pimp-prostitute relationship that bear on victims' credibility; (2) the testimony of L.V., defendant's "bottom" and victim of defendant's trafficking through threats of force and coercion, who will identify the minors defendant trafficked, explain how he trafficked them, and explain the violence and threats of violence defendant used to traffic her; (3) messages, videos, and photos from defendant's phone and Instagram account that show how defendant recruited, enticed, obtained, provided, harbored, transported, and maintained the victims for commercial sex work, as well as produced and possessed child sexual abuse material (CSAM) of Minor K.P. and Minor K.M.; (4) messages, videos, and photos from L.V.'s phone and laptop showing defendant's trafficking; (5) messages, photos, and videos from Minor K.M.'s Instagram accounts; (6) advertisements for Minor K.P. posted on Megapersonals, an online platform used to offer commercial sex, with a phone number subscribed to defendant; (7) law enforcement witnesses who arrested Minor K.P. for prostitution, including one time with L.V. at the time defendant was trafficking Minor K.P.; (8) law enforcement witnesses who arrested Minor K.M. for prostitution in Las Vegas, when defendant trafficked her across state lines; and (9) the testimony of Minor K.P.'s mother, who will testify about her efforts to recover Minor K.P. from the hotels where defendant was harboring

her, seeing L.V. at one of the hotels, seeing injuries on her
daughter's body when she recovered her from one of these hotels, and
her daughter's statement, while still in a state of distress, that
defendant caused these injuries.  As to the minor victims, this
evidence collectively shows that defendant knew, recklessly
disregarded the fact, and/or had the reasonable opportunity to
observe that his victims were minors; and he further recruited,
enticed, harbored, transported, provided, obtained, and/or
maintained Victims K.P., K.M., and L.C. (and knowingly advertised
Victim K.P.).  As to victim L.V., the evidence will show that
defendant used threats of force and coercion to sex traffic L.V.

**III. SUMMARY OF CHARGES**

For defendant's crimes, on February 24, 2023, a grand jury
returned a nine-count First Superseding Indictment charging
defendant with conspiracy to sex traffic and sex trafficking of a
minor with initials "K.P." (Counts One and Two); sexual exploitation
of Minor K.P. for the purpose of producing a sexually explicit
visual depiction, on or about December 24, 2021 (Count Three) and on
or about January 2, 2022 (Count Four); sex trafficking of a minor
with initials "K.M.") (Count Five); sexual exploitation of Minor
K.M. for the purpose of producing a sexually explicit visual
depiction (Count Six); sex trafficking of a minor with initials
"L.C." (Count Seven); possession of child pornography featuring
Minors K.P. and K.M. (Count Eight); and sex trafficking through
threats of force, fraud, or coercion as to L.V. (Count Nine).

**IV. LEGAL AND EVIDENTIARY ISSUES**

The parties have met and conferred regarding various pretrial
matters, including the authenticity and admissibility of the

government's exhibits; the use of transcripts with audio and video
evidence to aid the jury, which have been produced to defense
counsel; and the handling of CSAM and explicit images of minors, all
hard copies of which will stay in the case agent's possession at all
times during the case and will not go back with the jury, unless
otherwise directed by the Court.  Because these matters have been
agreed upon by the parties, the government does not set forth the
law governing the foundation and admissibility of the stipulated
evidence or the use of transcripts.  Rather, the following
categories describe matters not otherwise covered in the parties'
previous filings.

**A.   Use of Exhibits During Opening Statement**

The parties have agreed to identify any exhibits that they plan
to use in their respective opening statements, prior to trial.

Exhibits may be used in the opening statement, and so long as
the opening statement "avoids references to matters that cannot be
proved or would be inadmissible, there can be no error, much less
prejudicial error."  United States v. De Peri, 77826 F.2d 963, 979
(3d Cir. 1985); see also United States v. Rubino, 43127 F.2d 284,
290 (6th Cir. 1970).

**B.   Expert Testimony**

The government intends to introduce the expert testimony of
Special Agent James Hardie, consistent with the parameters set forth
in the Court's order denying in part and granting in part
defendant's motion to exclude this testimony.  (Dkt. 76.)  After
Special Agent Hardie describes his qualifications, principles, and
methodologies, the government will request that the Court make an
express reliability finding on the record, which can be done in

front of the jury, or, if defense counsel prefers, at sidebar or on a break before Special Agent Hardie offers his expert opinions.

The government makes this request pursuant the decision in United States v. Holguin, et al., 51 F.4th 841 (9th Cir. 2022), in which the Ninth Circuit held that "district courts must make explicit findings that the government's expert testimony was reliable." Id. at 851. As the Court explained, "[a] district court abdicates its gatekeeping role, and necessarily abuses its discretion, when it makes no reliability findings. Reliability findings must be made explicit on the record – an implicit finding does not suffice. This requirement ensures that district courts engage in the reliability inquiry and create a record of that inquiry to facilitate appellate review." Id. at 851 (citations/quotations omitted).

Here, defendant did not challenge the reliability of the government expert's methodologies or principles. (Dkt. 48.) Moreover, by analyzing the issues presented in defendant's motion and permitting expert testimony on the subjects set forth in the Court's order, the Court implicitly performed it gatekeeping function. However, given Holguin's directive that such findings be "explicit," the government therefore requests that the Court make a reliability finding on the record before the expert proffers his opinions.

**C.    Co-Conspirator Statements**

In addition to defendant's statements, the government intends to introduce co-defendant L.V.'s statements in furtherance of the conspiracy to traffic minors.

7

1    "Once a conspiracy is shown, the government need present only

2    slight evidence connecting a defendant to the conspiracy." United

3    States v. Crespo de Llano, 838 F.2d 1006, 1017 (9th Cir. 1988).  Co-

4    conspirator statements themselves may be used to establish the

5    existence of a conspiracy even before some separate evidence has

6    proved the conspiracy's existence.  Bourjaily v. United States, 483

7    U.S. 171, 180 (1987).

8        Courts apply a "liberal standard" in determining whether a

9    statement was made in furtherance of a conspiracy.  United States v.

10   Lloyd, 807 F.3d 1128, 1161 (9th Cir. 2015) (keeping others informed

11   of the conspiracy's activities).  Indeed, the exception can apply

12   even where the government has not charged a conspiracy count in the

13   indictment.  Id. at 1161; United States v. Fries, 781 F.3d 1137,

14   1151 (9th Cir. 2015).  The exception encompasses, "[m]ost

15   importantly, statements made to keep coconspirators abreast of an

16   ongoing conspiracy's activities," which, in this case, would include

17   updates regarding the minors' locations, the status of their

18   "dates," and how much money they made.  United States v. Yarborough,

19   852 F.2d 1522, 1535 (9th Cir. 1988).  It also encompasses statements

20   made to "set in motion transactions that are an integral part of the

21   conspiracy," – here, for example, statements about transporting the

22   minors to dates and efforts to provide the minors to clients.

23   **D.  Excited Utterance Hearsay Exception**

24       An excited utterance is "[a] statement relating to a startling

25   event or condition, made while the declarant was under the stress of

26   excitement that it caused." Fed. R. Evid. 803(2).  The district

27   court must determine that the declarant was "so excited or

28   distraught" at the time of the statement "that he did not reflect

1  (or have an opportunity to reflect) on what he was saying." United

2  States v. McLennan, 563 F.2d 943, 948 (9th Cir. 1977).  The "lapse

3  of time between the startling event and the out-of-court-statement

4  although relevant is not dispositive in the application of Rule

5  803(2)." United States v. Rivera, 43 F.3d 1291, 1296 (9th Cir.

6  1995).

7      In child sexual abuse cases, "courts must also be cognizant of

8  the child's first real opportunity to report the incident." Id.

9  (citation omitted).  "Rather than focusing solely on the time a

10  statement was made, courts must consider other factors, including

11  the age of the declarant, the characteristics of the event[,] and

12  the subject matter of the statements." Id.  In Rivera, for example,

13  the district court admitted statements that a fifteen-year-old rape

14  victim made about her assailant to her mother a half hour after the

15  rape, but as soon as she saw her mother, and while she was crying

16  and in a "semi-hysterical state." Id.  The Ninth Circuit affirmed,

17  noting that given the victim's "youthful age, the subject matter of

18  the statement and the characteristics of the event, the district

19  court did not abuse its discretion in determining that [the victim]

20  was still under the stress or excitement of the rape at the time she

21  made the challenged statements." Id.; see also People of the

22  Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993)

23  (considering that a child abuse victim's responses to police

24  questioning hours after the fact were admissible because the abuse

25  was "likely extremely traumatic" and it was reasonable to assume

26  that the declarant "still would have been under the stress of it").

27      Here, the government will seek to introduce several instances

28  of excited utterances, including but not limited to: (1) K.P.'s

excited utterances to L.V. the morning after defendant's sexual assault of K.P. (the incident described above wherein defendant forced himself on her by manually opening her legs and removing her hands from her genitals to access her) in which K.P. expressed that she was upset by what had happened and believed it had been filmed; (2) K.P.'s excited utterances to her mom that defendant caused injuries on her body, in part by dragging her across the carpet; (3) excited utterances by a sex worker named "Bentley" following a fight with defendant, which was memorialized in a video on her social media in which she was screaming and crying, and yelled "leave me the fuck alone," "who does that - pull bitches through a fucking window," and referenced L.V. as well; and (4) L.V.'s excited utterances to her friends following defendant's physical beatings – memorialized in text messages in which she said, among other things: "just got my ass beat," "he beat me up," "I feel like this ain't real," and "I got a big ass knot behind my head."[2]

---

[2]   L.V.'s statements regarding her injuries and K.P.'s statements to L.V. regarding being upset after her sexual encounter with defendant alternatively fall under Federal Rule of Evidence 803(3) – then-existing mental, emotional or physical condition. See generally United States v. Emmert, 829 F.2d 805, 810 (9th Cir. 1987) ("If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—`I'm scared'—and not belief—'I'm scared because Galkin threatened me.'") (citation and emphasis omitted). L.V.'s statement regarding her injuries and Bentley's statements regarding her physical fight with defendant also qualify as present sense impressions under Federal Rule of Evidence 803(1).  Fed. R. Evid. 803(1) (a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it"); see United States v. Orm Hieng, 679 F.3d 1131, 1142 n.2 (9th Cir. 2012) (reasoning that the term "event" must be constrained by "reasonable time limits," but that it did not require "instantaneous" accounts of the event).

### E.    Reciprocal Discovery

The government has requested reciprocal discovery and expert disclosures from the defense.  Defense counsel has indicated that he does not have any reciprocal discovery and does not intend to introduce an expert witness.  The government reserves the right to seek to preclude any documents or experts not previously disclosed. See Fed. R. Crim. P. 16(d)(2) ("[T]he court may . . . prohibit the party from introducing evidence not disclosed."); see also Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery requests before trial justified exclusion of unproduced evidence).

### F.    Affirmative Defenses

Defendant has not given notice of an intent to rely on any defense of mental incapacity, duress, entrapment, or alibi. Therefore, to the extent defendant may attempt to rely on any such defense, the government reserves the right to object and to seek to have defendant precluded from asserting such a defense.

## V.    CONCLUSION

The government respectfully requests permission to file a supplemental trial memoranda, if necessary.